DILLON H. PAYNE, Surviving Partner of the Firm of PAYNE & SOWERS, Appellee, v. DAVIS COUNTY, IOWA, Appellant.

**Attorney and client:** CONTRACT FOR COMPENSATION: CONSTRUCTION. Where attorneys enter into a written contract to try a law suit for a stipulated compensation the mere fact that unexpected work was performed with knowledge of the client, or even at his request, in defending the action on a counterclaim, does not give rise to an implied agreement for compensation additional to that stipulated in the writing.

*Appeal from Jefferson District Court.*—HON. C. W. VER-MILLION, Judge.

MONDAY, FEBRUARY 13, 1911.

THIS is an action on *quantum meruit* for the value of professional services. The defendant admits the services, but avers that they were rendered under an exprss written contract. The plaintiff in reply admits the execution of the written contract and the performance of services thereunder, but avers that the services claimed for in the petition were "independent, distinct, and different" from the services provided for in such contract, and that such "services were not covered thereby nor included therein, and were rendered under another and different contract of employment." There was a verdict and judgment for the plaintiff for $225. Defendant appeals.—*Reversed.*

*Taylor & Ramseyer, J. F. Scarborough, Leggett & McKemey,* and *C. F. Davis,* for appellant.

*Payne & Goodson, Jaques & Jaques,* and *Crail & Crail,* for appellee.

EVANS, J.—The plaintiff sues as the surviving member of the firm of Payne & Sowers, and also as assignee of others who were associate counsel in the suit hereinafter referred to. Payne & Sowers was a firm of attorneys engaged in practice at Bloomfield. In 1906 they entered into the following contract with the defendant county: "This agreement witnesseth: that Davis County, Iowa, hereby employs Payne & Sowers as attorneys to assist the county attorney in commencing and prosecuting a suit against the Chicago, Rock Island & Pacific Railway Company for damages by reason of the washing out of a county bridge over Soap Creek near Laddsdale and on section 6, township 70 north, range 12 west, in Davis County, Iowa, about June 9, 1905. Said Payne & Sowers are to receive 33 1-3 percent of whatever sum may be collected either on judgment or by settlement or compromise. Should nothing be collected, they are to make no charge for their services (but are to be paid their necessary expenses when necessarily away from home in connection with the conduct of said suit)."

In pursuance of this contract, suit was brought by Davis County against the railroad company referred to. This suit was resisted by the railroad company. As a part of its resistance, it set up a counterclaim against the county for $3,800 alleged damages sustained by it as a result of a washout. It was alleged that this washout was caused through the negligence of the county in the construction of a bridge over Sweet Water Creek. The county denied all liability on this counterclaim, and the final trial of the case involved the trial of the counterclaim. The counterclaim interposed was not in fact a valid claim against the county, and the jury found no liability thereon. The county recovered in such action a judgment for about $1,200. Such amount was paid into the hands of the plaintiff herein as attorney for the county. He retained one-third thereof as his fee under the con-

tract and paid the balance to the county, claiming, however, that he was entitled to compensation for extra services. The controlling question in this case is whether the plaintiff is precluded by his express contract from suing on a *quantum meruit* as for distinct and independent services rendered in resistance to the counterclaim in such former suit. The trial court instructed, in effect, that the plaintiff could not recover in this action unless he proved that a new contract was entered into subsequent to the written contract whereby services in relation to the counterclaim were contracted for as being independent and distinct from the services contemplated by the contract. In other words, it was held that the plaintiff could not recover unless a new contract was entered into subsequently to the written one. It is plain that no implied agreement to pay additional compensation for hard work encountered could arise from the written contract. The question then is: Was there a new contract which amounted to an agreement to pay a *quantum meruit* for alleged independent service? In finding for the plaintiff, the jury necessarily found that there was such new contract. Appellant urges that such finding has no support in the evidence. We have read and reread the evidence with much care and feel compelled to sustain this contention. The contention of the plaintiff is that such new contract was entered into orally at the September, 1907, session of the board of supervisors. The counterclaim was filed in the case November 17, 1906, and much labor had been expended upon it by the attorneys during the intervening time. Prior to the date named, the health of Mr. Sowers was such that he was unable to devote his attention to the case. He appeared before the board and asked to be released and relinquished all claim for compensation for services previously rendered. Mr. Payne also appeared before the board and asked that he also be released because of the condition of Mr. Sowers and be-

cause of the great labor involved in the case by reason of
the counterclaim and otherwise. In the conversation with
the members of the board at the time, they were insist-
ent that Mr. Payne should remain in the case, and this
was the substance of the talk which is relied on by the
plaintiff as evidence of a new contract. Excerpts of the
testimony have been gathered together in appellee's brief.
An excerpt from the testimony of Wray, one of the mem-
bers of the board of supervisors, is as follows:

The matter was brought up, I think, that if Mr.
Payne would go ahead with the case, and Mr. Sowers
wasn't able to attend to it, that Mr. Payne would take
charge of it, that it would be all right to let Mr. Sowers
off. As it was they had already been in the case and had
taken evidence in the case, that they would know more
about the case than any one else, that we could not afford
to let them out of the case; that is the way I remember it,
and I think I so informed them. I think probably there
was something said in the September, 1907, session by Mr.
Payne with reference to the fact that the counterclaim
was a large claim, and that it would require a longer time
to try the case, and he didn't want to close his office and
be away from home so much longer than he had expected
to try that counterclaim. It kind of runs in my mind that
the board said that you (Payne) had more to do with the
matter than any one lawyer, and that they wanted you to
stay in the case, and I think the board told you that they
wanted you to stay in the case and help to fight the whole
business. It possibly might have been said, and it occurs
to me possibly there was something said (by Payne), that
Jaques & Jaques were in the case and were familiar with
the facts now, and that he thought that firm and Mr. Good-
son could try the case all right, and the board said that:
'We want all of you; we want all of your services now'
—or something in substance like that.

The following excerpt from the testimony of the
plaintiff as a witness gives his version of what transpired
before the board at that time:

After this counterclaim was filed, I had some talk with the members of the board of supervisors during the September session in the fall of 1907 about the fact that my partner Mr. Sowers' health had failed him, and that he was going out of business and wanted to be released on that account. I went over to see the board. They were in session, and I said to the board of supervisors that Mr. Sowers' health had failed, and that he was not able to help in the case and was going to go away, and that I would like to get out of the case entirely because I would have to close the office and be away from home during the trial; that I would rather not serve any farther in the matter, and some of the board spoke up and said they had been talking with the county attorney, and he advised them that they could dismiss their case against the Rock Island Railway Company, but that they couldn't dismiss the counterclaim filed against the county, that if they could dismiss their part of the case and quit and get rid of the whole case they would be willing to just let it all go, but the railroad company had sued them for a large amount, and they would have to fight that out, and they concluded if they had to fight that they would just fight the whole thing, there was no advantage in dismissing their case against the railroad company, and I said to them, to fight the counterclaim would take as much time or work as the other and it would take a good deal more time, than to try the original case and it would take me away from home that much longer, and I would have to shut up my office and be away, and, while I had done a good deal of work on the counterclaim in the way of presenting the motion to dismiss and the demurrer, that I was willing to charge nothing for my services for what I had done if they would release me and let me out of the case entirely, and they talked among themselves there a little bit in my presence, and they suggested that they would like to have the benefit of my services and for me to continue in the case, and I said to them that Jaques & Jaques were lawyers of Ottumwa who were acquainted with the jury, were lawyers of experience, and that the county attorney would help in the case, and that I thought they were entirely capable to handle the case without my services, and I would be willing to charge nothing and pay my own expenses, what

I was out, if they would excuse me and let me out of the case, and they said they didn't feel that they could do that, that they felt that they needed the services of all of us in that case, that the railroad company had a big claim for damages, and they would have to fight it, and they had concluded to put up the best fight they could, something like that. That was substantially our talk, and I went on with the case. Soon after this my partner, Mr. Sowers, left and went to Arizona. Before this talk in September, there had been a demurrer filed in the spring of 1907. I also said if they would let me out of the case that I, that Mr. Sowers and I, had been looking up the evidence in regard to the Sweet Water bridge, had presented a motion and demurrer and filed the answer, and we would not charge anything for those services and would lose our expenses that we were out, if they would release me from the case. Some of the members said I was acquainted with the witnesses and had been associated in these other cases and had been looking up the law, and the amount of the counterclaim was a very large amount, and that they felt like they wanted all of our services in that case in order to try it.

The foregoing is quite illustrative of it all. We find nothing in the evidence which tends to show any modification of the former contract, or that any new contract was contemplated. The insistence of the members of the board was entirely consistent with the provisions of the written contract. The counterclaim was discussed and the labor involved in its trial; but there was not a suggestion from either side concerning additional compensation. Nor do we find any evidence tending in any degree to show that the defense of the counterclaim was deemed by either party as independent and distinct from the services contemplated in the written contract. It is urged upon our attention that the plaintiff firm only undertook to prosecute a suit against the railroad company, and that they were not bound thereby to defend counterclaims. It is argued that a counterclaim is not a defense, but is an independent

cause of action.    But this is resting the argument upon
mere terminology.    When the contract was entered into,
neither party could foresee just what obstacles would be
interposed by the defendant in that suit in the way of .re-
covery.    Granting that a counterclaim is not technically a
defense as a question of pleading, it is nevertheless one of
the familiar weapons of a fighting defendant.    The coun-
terclaim filed in that case, though invalid in fact, neces-
sarily obstructed the way of the county toward a recovery
against the railroad company.    The plaintiff herein as an
attorney for the county could not carry out his written con-
tract without dealing with such counterclaim.    If this im-
posed unexpected burdens upon him, this fact might be
deemed sufficient cause for a new contract for additional
compensation.    But, in the absence of such new contract,
the mere fact that such unexpected labor was performed
with the knowledge of the client, and even at its request,
did not give rise to an implied agreement for other com-
pensation than that stipulated in the written contract.
This point is quite covered by the case of *Lindsay v. Car-
penter*, 90 Iowa, 529.    In that case the attorneys agreed
with their client to defend a suit against him for an agreed
compensation of $25.    In the performance of such contract
they not only defended the suit in the strict sense of the
term, but they set up also a counterclaim in favor of the
client.    A trial was had both upon the petition of plain-
tiff and the counterclaim of defendant.    The attorneys
sued for additional compensation by reason of the addi-
tional services rendered in the prosecution of the counter-
claim, and were denied a recovery.    Quite in point is
*McKay .v. Lancaster*, 15 Ky. Law Rep. 159.    See, also,
*Moses v. Bagley*, 55 Ga. 283.

It is only fair to plaintiff to say that we are impressed
from this record that the services rendered by him and his
associates to the defendant county were fairly worth the
sum received under the contract and the additional com-

pensation of $225 allowed by the jury in this case. The services rendered were arduous and successful and merited recognition. But we are compelled to hold, nevertheless, that they were rendered in pursuance of the written contract; that there is no evidence in this record to support a finding that a new contract was entered into in September, 1907; and that, in the absence of a new contract whereby additional compensation was mutually contemplated, as for additional services, no implied agreement for a *quantum meruit* can arise. The conclusion we reach in this general way is decisive of the case, and we have no occasion to discuss alleged specific errors either in the admission of testimony or in the instructions of the court.

The judgment below must therefore be *reversed*.